## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SCOTT EDELMAN,** | |
| **Plaintiff,** | **Case No.  21 Civ. 3109** |
| -against- | |
| **ARISTOCRAT PLASTIC SURGERY P.C.,** and **KAYVON TEHRANI,** | |
| **Defendants.** | |

## COMPLAINT

Plaintiff Scott Edelman ("Edelman"), by and through his attorneys, Kessler Matura P.C., complaining of Defendants Aristocrat Plastic Surgery P.C. ("APS") and Kayvon Tehrani ("Tehrani," together with APS, "Defendants"), alleges as follows:

## INTRODUCTION

1.      Diagnosed with COVID-19, lying in a hospital bed, barely able to breath, and afraid for his life, Scott Edelman received a text message from his employer on March 22, 2020: APS was "temporarily" laying him off.  Dr. Kayvon Tehrani, APS' owner and sole full-time surgeon at the medical clinic knew about Edelman's dire condition, as the two continuously texted throughout Edelman's hospitalization.  While APS furloughed some employees, Tehrani decided to keep on several APS employees with responsibilities overseen by Edelman.  But with Edelman in the hospital, Tehrani excluded him.

2.      Edelman was discharged from the hospital on April 6, 2020.  However, he developed "long-haul" COVID-19 and continued to suffer the effects after his release from the hospital.  Throughout, Edelman updated Tehrani about his condition.  On May 20, 2020, while

Edelman still faced the effects of his illness and only days before APS brought back almost its entire staff, Tehrani called Edelman to tell him he was terminated for good.

3.      Edelman's tenure at APS began in July 2013, when he was hired as Vice President of Business Affairs and General Counsel to help drive up APS' revenue and handle day-to-day business, financial, and legal affairs.  Tehrani and Edelman formed a written agreement that Edelman would receive ten percent of revenue increases from where revenue stood at his start.

4.      Revenue jumped with Edelman on board, more than doubling over his tenure. However, Tehrani only paid Edelman what he was owed for two of his almost seven years at APS.

5.      Not only did Tehrani refuse to provide any reasonable accommodation for Edelman to work, he refused to pay Edelman what he had earned.

## NATURE OF THE CLAIMS

6.      The unlawful discrimination described herein was committed in violation of Section 504 of the Rehabilitation Act of 1973 ("Rehabilitation Act"), 29 U.S.C. § 794 *et seq.*, the New York State Human Rights Law ("NYSHRL"), N.Y. Executive Law §§ 290 *et seq.*, and the New York City Human Rights Law ("NYCHRL"), N.Y. City Administrative Code §§ 8-101 *et seq.*

7.      The failure to pay earned commissions described herein constitutes a violation of N.Y. Labor Law §§ 190, *et seq.* ("NYLL") and a breach of contract in violation of common law.

8.      Plaintiff has filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") and intends to file an Amended Complaint alleging violations of the Americans with Disabilities Act Amendments Act of 2008, 42 U.S.C. § 12101, *et seq.* ("ADAAA"), following the EEOC's completion of its investigation and/or issuance of a Notice of Right to Sue.

2

9.      Following commencement of this action, a copy of this Complaint will be served both on the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York, thereby satisfying the notice requirements of the NYCHRL.

10.     Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION & VENUE

11.     Jurisdiction of the Court over this controversy is based upon the Rehabilitation Act.

12.     This Court has supplemental jurisdiction over Plaintiff's state and local law claims pursuant to 28 U.S.C. § 1367(a).

13.     Venue is proper within this Judicial District pursuant to 28 U.S.C. § 1391 because all or a substantial part of the events or omissions giving rise to the claims herein occurred in the Eastern District of New York.

## THE PARTIES

**Plaintiff Scott Edelman**

14.     Plaintiff Scott Edelman is a resident of Nassau County, New York.

15.     At all times relevant, Plaintiff was an "employee" within the meaning of all applicable statutes.

**Defendants**

***Defendant Aristocrat Plastic Surgery P.C.***

16.     Defendant APS is a private health clinic that provides cosmetic plastic and reconstructive surgery and other non-surgical procedures.

17.     At all times hereinafter mentioned, APS was and still is an "employer" within the meaning of all applicable statutes.

3

18.     At all times relevant to the Complaint, APS was and still is a professional corporation organized and existing pursuant to the laws of the State of New York.

19.     APS has two locations.  APS' Manhattan Office is located at 33 West 56th Street, in New York, New York ("Manhattan Office").  APS' Long Island Office is located at 560 Northern Boulevard, Suite 109, in Great Neck, New York ("Long Island Office").

20.     Upon information and belief, APS seeks to accept Medicare as a form of payment for its medical services.

21.     Upon information and belief, APS is authorized to accept Medicare as a form of payment for its medical services.

22.     Upon information and belief, APS accepts Medicare as a form of payment for its medical services.

***Defendant Kayvon Tehrani***

23.     Tehrani is a medical doctor licensed in the State of New York.

24.     Upon information and belief, and at all times hereinafter mentioned, Tehrani owns and/or operates APS.

25.     Upon information and belief, Tehrani is the Chief Executive Officer of APS.

26.     Upon information and belief, and at all times hereinafter mentioned, Tehrani is the President of APS.

27.     Upon information and belief, and at all times hereinafter mentioned, Tehrani is a shareholder of APS.

28.     Upon information and belief and at all times hereinafter mentioned, Tehrani is an agent of APS.

29.    Upon information and belief, and at all times hereinafter mentioned, Tehrani has authority over personnel decisions for APS.

30.    Upon information and belief, and at all times hereinafter mentioned, Tehrani supervises employees of APS.

31.    Upon information and belief, and at all times hereinafter mentioned, Tehrani has the authority to hire and fire employees for APS.

32.    Upon information and belief, and at all times hereinafter mentioned, Tehrani has authority over payroll decisions for APS.

33.    Upon information and belief and at all times hereinafter mentioned, Tehrani has power to make binding decisions for APS.

34.    At all times hereinafter mentioned, Tehrani was and still is an "employer" within the meaning of all applicable statutes.

35.    Upon information and belief, Tehrani seeks to accept Medicare as a form of payment for his medical services.

36.    Upon information and belief, Tehrani is authorized to accept Medicare as a form of payment for his medical services.

37.    Upon information and belief, Tehrani accepts Medicare as a form of payment for his medical services.

## FACTS

**APS Failed to Pay Edelman Earned Commissions**

38.    In 2012, Tehrani and Edelman began talks for APS to hire Mr. Edelman.  At the time, Edelman was a named partner at a law firm, which had represented APS for several years.

5

39.     Edelman and Tehrani discussed that Edelman would use his multifaceted skillset – Edelman was a CPA and attorney, working as Managing Partner at his law firm, which he had help grow in revenue during his tenure – to drive up APS' revenue and administer APS business, legal, and financial matters.  In turn, Tehrani and Edelman agreed to tie a portion of Edelman's compensation to APS' revenue growth.

40.     In June 2013, Edelman and Tehrani began negotiating specific terms for Edelman's employment agreement, which Edelman reduced to a papered draft.

41.     The initial draft of the employment agreement contained a commissions clause, stating "Edelman will receive payments equal to 5% of revenue of [APS] between $3,200,000 and $3,500,000.  Edelman will receive payments equal to 20% of revenue of [APS] between $3,500,000 and $4,000,000.  Edelman will receive 25% of revenue of Aristocrat in excess of $4,000,000.  All payments under this section are to be made biweekly."  The draft employment agreement also contained clauses regarding Edelman's base salary and other benefits.

42.     After exchanging the initial draft, Edelman and Tehrani continued their negotiation regarding revenue-tied compensation.

43.     After coming to a verbal agreement, Edelman reduced a final agreement to writing, solely changing the commissions clause from the previous iteration.  Edelman emailed the final agreement to Tehrani on June 19, 2013 as an attachment, stating in the email body that he had "enclosed the changes as discussed."

44.     The final agreement contained a new commissions provision: "Edelman will receive payments equal to 10% of total revenue of [APS] over $3,500,000.  All payments under this section are to be made biweekly."

6

45.     While neither Edelman nor Tehrani signed the agreement, on June 20, 2013, Tehrani responded by email, stating "Awesome. . . . We should celebrate you coming on board." Tehrani inscribed his name at the bottom of the email.

46.     Edelman started his employment with APS as Vice President of Business Affairs and General Counsel on July 1, 2013.

47.     He held that position for the entirety of his employment.

48.     Edelman's responsibilities at APS included business growth and management, including marketing and account management, as well as a wide array of legal and financial matters, such as real estate acquisition and rental, contract drafting and negotiation, debt and loan management, accountant oversight, and litigation management.

49.     The first two years of Edelman's employment went according to the agreement.

50.     Between July 1, 2013 and June 30, 2014, Edelman's first year, APS earned approximately $4,112,823 in revenue.

51.     On June 30, 2014 – the final day of Edelman's first year – Edelman sent a message to Tehrani via Nextech, APS' internal messaging system, regarding the commissions he earned. The message stated "$4,112,823; 10% of 612,283 = 61,282.  $2357 per pay period."

52.     Tehrani responded less than one minute after Edelman's message, stating "great, enjoy my friend:).  please call payroll. [sic]"

53.      Over the next year, APS paid Edelman the earned $61,282, abiding by the agreement with Edelman to pay the equivalent of 10% of all APS revenue over $3,500,000.

54.     After the July 2014 – June 2015 year, APS never paid Mr. Edelman the entirety of his earned commissions again.

7

55.     Edelman went to Tehrani on numerous occasions to request payment of his earned commissions.

56.     In February 2016, as a partial payment for earned commissions, Tehrani increased Edelman's annual salary by $30,000 and added $1,000 to his monthly expense account.

57.     On other occasions where Edelman asked for payment of the earned commissions, Tehrani would invariably make an excuse for why APS could not pay at the time.

**APS/Tehrani Discriminated Against Edelman Because He Contracted COVID-19**

58.     On Saturday, March 14, 2020, Edelman began to feel ill while in his home.

59.     The following day, Sunday, March 15, Edelman experienced a persistent bronchitis-like cough and high fever.  He spoke by telephone with his cardiologist, who advised that he quarantine in his den and seek a test for COVID-19.

60.     After speaking with his doctor, Edelman called Tehrani to inform him that he was sick and would not be at work the following day.

61.     On Monday, March 16, Edelman exchanged a series of text messages with Tehrani regarding his symptoms.

62.     Edelman went to Northwell Health Lab at Plainview Hospital for testing on Tuesday, March 17.   He received tests for the flu and the coronavirus.  The flu test came back negative while Edelman was at the lab.

63.     After receiving the tests, Edelman again exchanged text messages with Tehrani to inform him of the tests and his worsening symptoms.

64.     Edelman's symptoms worsened to included shortness of breath and on Wednesday, March 18, he was admitted into North Shore University Hospital.

65.     While still at the hospital on Thursday, March 19, Edelman received confirmation that he had tested positive for SARS-CoV-2 and had developed COVID-19.

66.     Later that Thursday, March 19, Edelman sent several text messages to Tehrani to apprise him of the positive COVID-19 test and hospitalization.  Tehrani responded that he would have to close APS' Great Neck office because Edelman was there prior to becoming symptomatic.

67.     The hospital staff decided to discharge Edelman on Thursday, March 19, believing his symptoms would improve.

68.     However, by Friday, March 20, Edelman's breathing had become so constrained that he had difficulty walking more than a few steps.  Edelman returned to North Shore University Hospital, where he was again admitted.

69.     On Saturday, March 21, Edelman exchanged text messages with Dr. Tehrani and informed him that he had returned to the hospital.

70.     On Sunday, March 22, Edelman received a text message from an APS outside consultant, Shana Ackerman ("Ackerman"), stating that APS had "temporarily" terminated his employment along with other APS employees at its Great Neck, New York office.

71.     The text message from Ackerman further stated that APS sought to backdate the termination to March 13, 2020.

72.     On or around March 22, APS cut off Edelman's access to its systems, including email.

73.     Edelman remained in the hospital until April 6.  For many of the days he was hospitalized, Edelman required an oxygen face mask to breath, which supplied oxygen at the maximum possible level.  On several occasions, the hospital doctors contemplated intubating Edelman given the high level of oxygen he required.

9

74.    Approximately five APS employees remained employed at APS in March 2020, including some employees with administrative responsibilities that Edelman oversaw on a daily basis.

75.    Neither Ackerman, Tehrani, nor anyone else at APS discussed Edelman taking a leave of absence or any other form of accommodation after learning of his illness and hospitalization.

76.    Edelman suffered from "long-haul" COVID-19 and experienced symptoms long after his discharge from the hospital.  He continued to exchange frequent text messages with Tehrani regarding his symptoms.

77.    On or around May 20, 2020, Tehrani called Edelman and informed him that APS would not bring him back on staff.

78.    At that time, Edelman still suffered from the effects of COVID-19.

79.    In June 2020, APS brought almost all of its staff back to work.

80.    Neither Tehrani nor any other APS employee engaged in any form of interactive process or cooperative dialogue to discuss possible accommodations that might have allowed Edelman to return to work then or in the future.

**Edelman's Employment and Termination Impacted New York City**

81.    The impact of APS' termination of Edelman was and continues to be felt in New York City.

82.    Edelman worked as Vice President of Business Affairs and General Counsel at the Long Island Office and the Manhattan Office.

83.     In or around September 2015, Defendants purchased the current location for the Manhattan Office.  Edelman handled many of the tasks related to the purchase, including securing the loan.

84.     From November 2015 to June 2019, Defendants renovated the Manhattan Office.

85.     Edelman oversaw the construction process, including negotiation of relevant contracts, communication with contractors and vendors, and daily site visits.

86.     Edelman was responsible for much of the business affairs conducted at the Manhattan Office, including payroll, vendor contract negotiation and management, prospective employee interviews, benefits coordination, payment of mortgages and taxes, supply orders, and marketing inquiries.

87.     Throughout his employment, Edelman communicated with and provided oversight to employees in the Manhattan office on a daily basis.  He also regularly attended practice meetings and events in the Manhattan Office.

## FIRST CAUSE OF ACTION
## DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE
## IN VIOLATION OF THE REHABILITATION ACT

88.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

89.     Plaintiff was rendered disabled when he contracted COVID-19.

90.     Defendants were aware of Plaintiff's disability.

91.     Defendants perceived Plaintiff as disabled.

92.     Defendants intentionally discriminated against Plaintiff.

93.     By the acts and practices alleged above, Defendants violated their duty to institute and engage in an interactive process with the Plaintiff to attempt to find a reasonable accommodation for him.

94.     Further, Defendants failed to provide Plaintiff with a reasonable accommodation.

95.     Defendants took an adverse employment action against Plaintiff because he was disabled or regarded as disabled.

96.     Defendants knew that their actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutorily protected rights.

97.     As a consequence of the discrimination engaged in by Defendants, Plaintiff has suffered severe damages, including, but not limited to, deprivation of income and benefits, loss of opportunity for advancement and promotion, and emotional distress.

**SECOND CAUSE OF ACTION**
**DISABILITY DISCRIMINATION AND FAILURE TO ACCOMMODATE**
**IN VIOLATION OF THE NYSHRL**

98.     Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

99.     Plaintiff was rendered disabled when he contracted COVID-19.

100.    Defendants were aware of Plaintiff's disability.

101.    Defendants perceived Plaintiff as disabled.

102.    Defendants intentionally discriminated against Plaintiff.

103.    By the acts and practices alleged above, Defendants violated their duty to institute and engage in an interactive process with the Plaintiff to attempt to find a reasonable accommodation for him.

104.    Further, Defendants failed to provide Plaintiff with a reasonable accommodation.

105.    Defendants took an adverse employment action against Plaintiff because he was disabled or regarded as disabled.

106.    Defendants knew that their actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutorily protected rights.

107.    As described herein, Defendant Tehrani aided and abetted the discriminatory conduct.

108.    As a consequence of the discrimination engaged in by Defendants, Plaintiff has suffered severe damages, including, but not limited to, deprivation of income and benefits, loss of opportunity for advancement and promotion, and emotional distress.

## THIRD CAUSE OF ACTION
## DISABILITY DISCRIMINATION IN VIOLATION OF THE NYCHRL

109.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

110.    Plaintiff was rendered disabled due to contraction of COVID-19.

111.    Defendants were aware of Plaintiff's disability.

112.    Defendants perceived Plaintiff as disabled.

113.    Defendant intentionally discriminated against Plaintiff.

114.    By the acts and said practices alleged above, Defendants treated Plaintiff less well than other non-disabled employees.

115.    Further, Defendants took an adverse employment action against Plaintiff because he was disabled or regarded as disabled.

116.    Defendants knew that their actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutorily protected rights.

117.    As a consequence of the discrimination engaged in by Defendants, Plaintiff has suffered severe damages, including, but not limited to, deprivation of income and benefits, loss of opportunity for advancement and promotion, and emotional distress.

**FOURTH CAUSE OF ACTION**
**FAILURE TO ENGAGE IN COOPERATIVE DIALOGUE**
**IN VIOLATION OF THE NYCHRL**

118.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

119.    Plaintiff was rendered disabled and unable to work due to his contraction of COVID-19.

120.    Defendants were aware of Plaintiff's disability.

121.    Defendants perceived Plaintiff to be disabled.

122.    Defendants intentionally discriminated against Plaintiff.

123.    By the acts and said practices alleged above, Defendants have violated their independent duty to institute and engage in a cooperative dialogue with Plaintiff in an attempt to find a reasonable accommodation for him.

124.    Further, Defendants failed to provide Plaintiff with a reasonable accommodation.

125.    Defendants knew that their actions constituted unlawful discrimination and/or showed reckless disregard for Plaintiff's statutorily protected rights.

126.    As a consequence of the discrimination engaged in by Defendants, Plaintiff has suffered severe damages, including, but not limited to, deprivation of income and benefits, loss of opportunity for advancement and promotion, and emotional distress.

## FIFTH CAUSE OF ACTION
## FAILURE TO PAY EARNED COMMISSIONS
## IN VIOLATION OF NEW YORK LABOR LAW

127.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

128.    NYLL § 193 prohibits an employer from deducting from an employee's wages, except in limited circumstances.

129.    The unpaid commissions are wages as defined by NYLL § 190(1).

130.    Plaintiff earned commissions for each year of his employment with Defendants.

131.    Defendants violated NYLL § 193 by failing to pay Plaintiff his entire earned commissions for the years 2015, 2016, 2017, 2018, 2019, and 2020.

132.    Defendants' violation of NYLL § 193 was willful.

133.    Due to Defendants' NYLL violations, Plaintiff is entitled to recover from Defendants his earned wages, liquidated damages, reasonable attorneys' fees, and costs of this action, all in an amount to be determined by this Court.

## SIXTH CAUSE OF ACTION
## BREACH OF CONTRACT
## IN VIOLATION OF COMMON LAW

134.    Plaintiff realleges and incorporates by reference all allegations in all preceding paragraphs.

135.    Plaintiff and Defendants entered into an enforceable employment contract that included the payment of commissions.

136.    Defendants were obligated to pay Plaintiff the commissions pursuant to the employment agreement.

137.     Defendants breached their obligations under the agreement by failing to pay Plaintiff his earned commissions.

138.     Defendants' breach was not due to any act of Plaintiff.

139.     As a result, Plaintiff suffered damages in an amount to be determined by the Court.

## <u>DEMAND FOR JURY TRIAL</u>

140.     Plaintiff herein demands a trial by jury for all issues in this action.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff Scott Edelman demands that a judgment be entered in his favor and that the Court order and award Plaintiff the following relief against Defendants:

A.     A declaratory judgment that the actions, conduct, and practices of Defendants complained of herein violate the laws of the United States, the State of New York, and the City of New York;

B.     An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all monetary and/or economic damages;

C.     An award of damages against Defendants, in an amount to be determined at trial, plus interest, to compensate for all non-monetary and/or compensatory damages, including, but not limited to, compensation for Plaintiff's emotional distress;

D.     An award of punitive damages in an amount to be determined at trial;

E.     An award of liquidated damages in an amount to be determined at trial;

F.     Pre-judgment interest on all amounts due;

G.     An award of Plaintiff's reasonable attorneys' fees and costs; and

H.      Such other and further relief as the Court may deem just and proper.


Dated: Melville, New York
        June 2, 2021

                                    Respectfully submitted,

                                    By: /s/ Troy L. Kessler
                                        Troy L. Kessler

                                    **KESSLER MATURA P.C.**
                                    Troy L. Kessler
                                    534 Broadhollow Road, Suite 275
                                    Melville, New York 11747
                                    (631) 499-9100
                                    tkessler@kesslermatura.com

                                    ***Attorneys for Plaintiff***

17